Filed 6/18/14  In re Elijah W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re ELIJAH W., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065012 |
| Plaintiff and Respondent, | (Super. Ct. No. J518366) |
| v. | |
| BRITTNY B., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Affirmed.

Neale B. Gold, by appointment of the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel for Plaintiff and Respondent.

Law Office of William Hook and William Hook, by appointment of the Court of Appeal, for the Minor.

Brittny B. appeals from a Welfare and Institutions Code[1] section 366.36 hearing where a permanent plan of adoption was implemented for her son, Elijah W. On appeal Brittny asserts (1) the court abused its discretion when it ordered permanent placement with his relative caretaker, Joyce B., because she was ambivalent about adopting Elijah; and (2) the court lacked substantial evidence to support its determination that the beneficial parent-child exception to adoption was inapplicable. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*

In February 2012 the Agency filed a petition in the juvenile court under section 300, subdivision (b). The detention report of the San Diego County Health and Human Services Agency (Agency) summarized the events preceding the filing of the petition in this case. On February 23, 2012, Brittny was arrested by the National City Police Department (NCPD) because she had active warrants for commercialized sex. Brittny has a criminal history for prostitution.

Further investigation revealed that Brittny had left six-month-old Elijah with the father (Brittny's pimp) in a hotel room full of drugs and drug paraphernalia which were accessible to the child. The hotel room was full of marijuana smoke and Elijah had been left in this room for several hours while Brittny was out. Elijah had a very strong odor of

---

1 All further statutory references are to the Welfare and Institutions Code.

2

marijuana emanating from his clothing. Brittny was cited for loitering with the intent to prostitute. The father was arrested for pimping and child endangerment. NCPD took Elijah into protective custody and transported him to the local children's shelter.

At the detention hearing on February 28, 2012, the court ordered out-of-home detention for Elijah and ordered unsupervised visitation on the grounds of the children's shelter.

The Agency's jurisdiction report dated March 20, 2012, stated Elijah remained in out-of-home care. He was detained in a confidential licensed foster home. Social worker Kali Chosich reported Brittny's criminal history consisted of several arrests for prostitution dating back to 2008. The father had a lengthy criminal history relating to drugs, including transporting and selling drugs. Brittny told the social worker she did not believe the father was smoking marijuana in Elijah's presence or that Elijah smelled like marijuana when police arrived. Brittny also claimed she was no longer a prostitute.

At this time, Brittny was visiting Elijah twice per week in a supervised setting. Brittny ended one of her visits early because Elijah fell asleep. Social worker Chosich encouraged Brittny to hold Elijah until the end of the visit and Brittny replied, "'I wanted to play with him, not watch him sleep. I'll see him on Friday.'"

On April 12, 2012, the juvenile court found jurisdiction under section 300, subdivision (b), declared Elijah a dependent of the juvenile court, and placed him in licensed foster care, but gave the Agency discretion to move Elijah to the home of an approved relative.

3

The Agency's October 9, 2012 six-month status review report noted that Elijah was placed with his maternal great aunt, Joyce, in April 2012. Social worker Tania Romero reported that Elijah was doing well in his current placement and building relationships with his maternal relatives.

Brittny was participating in individual therapy and parenting classes, and seeking employment and housing. However, she failed to show up for a drug test in July of 2012 and continued to minimize the original protective issue. In May 2012 Brittny missed two visits and, after she was incarcerated in August of 2012, she stopped attending her weekly visits and sporadically saw Elijah at daycare for several months. In December 2012 Brittny moved closer to Elijah and visited Elijah during the week.

The father failed to maintain contact with Elijah for over six months and was charged in Nevada with a "lewd act on a minor under 14 years of age." Based upon these facts, the court terminated the father's reunification services.

At the 12-month permanency hearing held in April 2013, social worker Romero reported that Elijah was placed in Brittny's care on February 22, 2013, for a trial visit. Brittny and Elijah were living in the maternal grandmother's home. One month later, on March 29, 2013, Brittny was arrested for prostitution in Las Vegas. Brittny had fled to Las Vegas with Elijah and in the apartment where Brittny and Elijah were residing police officers found cocaine, open cans of beer, and other unsafe items. In addition, Brittny admitted to leaving Elijah in the care of the paternal grandmother who has an extensive history of child abuse. Brittny once again minimized her actions and denied knowing

4

there were drugs in the apartment. Elijah was taken into emergency protective custody by the Las Vegas Police Department.

Upon return to San Diego, Elijah was placed back in the home of Joyce who indicated she wanted to care for Elijah on a permanent basis and expressed her interest in adoption. Brittny's visits returned to supervised.

Based on a lack of substantive progress with treatment goals, the court terminated Brittny's reunification services and set a section 366.26 hearing to determine a permanent plan for Elijah.

Elijah's section 366.26 selection and implementation hearing was held on September 17, 2013. Social worker Shari Crall recommended that the juvenile court terminate parental rights and order a permanent plan of adoption. Brittny set the matter for trial on the issue of the beneficial relationship exception to adoption. Elijah's counsel set the matter for trial on the issue of changing his prospective adoptive placement.

B. *Contested Section 366.26 Hearing*

At the October 4, 2013 contested hearing, the trial court received into evidence the section 387 detention report dated October 4, 2013; the section 366.26 assessment report; and the addendum report dated September 30, 2013.

1. *Assessment and addendum report*

Social worker Crall prepared the assessment and addendum report recommending adoption. Crall opined that Elijah was highly adoptable due to his young age and good health and because he was generally developmentally on target. Fifty-one approved

5

adoptive families in San Diego County wanted to adopt a child with Elijah's characteristics.

Initially, Elijah's current caretaker, Joyce, expressed concern about her ability to care for Elijah on a permanent basis. Therefore, a team decision meeting (TDM) was held and several close relatives indicated they were interested in adopting Elijah. Elijah's maternal stepgrandmother, Robin M., expressed a strong desire to adopt Elijah and Robin began the home approval process. Based on a preliminary background check, the Agency did not foresee any obstacles to approving Robin's home. During the TDM, Joyce noted she had child care issues and expressed feeling pressured to keep Elijah on a permanent basis. Joyce stated several times during the meeting that Robin was a better placement choice for Elijah.

The Agency recommended Elijah be moved to Robin's care. Elijah's caretaker, Joyce, was in support of Elijah being moved to Robin's care. A transition plan was initiated.

Joyce later indicated she was interested in adoption. Approximately one month after the TDM, Joyce told social worker Crall she was at a level 10 on her commitment to adopt Elijah and was exploring a solution for daycare while she was at work. Joyce loved Elijah and did not want him to be adopted by anyone else because she had cared for him since he was an infant. The Agency praised Joyce as an excellent caregiver, but expressed concern that she could not provide a permanent placement to adulthood given

her ambivalence to adopt. Given Elijah's young age and the instability he had already endured, the Agency continued to recommend Elijah be moved to Robin's home.[2]

In recommending a plan of adoption, social worker Crall opined that none of the statutory exceptions applied. In her opinion, Elijah had an anxious and detrimental relationship with Brittny. Elijah had difficulties entertaining himself in Brittny's presence and seemed anxious about Brittny's whereabouts. Social worker Crall opined that Elijah needed a secure attachment in order to attain his full intellectual potential, develop a conscience, trust others, become self-reliant, overcome common fears and worries, and increase his self-esteem. Elijah's need for a permanent and stable home outweighed any detriment Elijah would suffer if parental rights were terminated.

Brittny did not visit Elijah the entire month of June 2013. In July 2013 Brittny visited once. In August 2013 Brittny visited Elijah twice in Robin's home. Social worker Crall was present for both August visits.

Social worker Crall described the August 7, 2013 visit overall as appropriate. She reported that although Brittny maintained a flat affect and did not show any expression or emotion, she responded to Elijah's needs and promptings. Elijah displayed physical affection towards Brittny and was comfortable in her presence. When Brittny first arrived Elijah clung on to Brittny's leg; however, Elijah was willing to take direction

---

[2]     The Agency admits that at the trial level it supported moving Elijah's placement from Joyce to Robin. However, on appeal the Agency contends the evidence supports the court's decision to leave Elijah in Joyce's care.

from all adults and he followed social worker Crall to her car—and out of Brittny's sight—without incident.

During Brittny's visit on August 23, 2013, Brittny attended to Elijah's needs, and he willingly went to Brittny and relied upon her throughout the visit. However, at one point during the visit Brittny left with her boyfriend without telling social worker Crall or Elijah. Elijah displayed anxiety and the maternal grandmother had to soothe Elijah and care for him during Brittny's absence. The maternal grandmother claimed Brittny left the visit to get disposable cameras so she could take pictures. Thirty minutes later social worker Crall had to leave and Brittny had still not returned. It is unknown whether Brittny returned to the visit and, if so, how long she was absent. After this visit, Brittny did not call or visit Elijah the rest of August 2013 or in the month of September 2013.

2. *Testimony of Social Worker Crall*

Social worker Crall had been an adoptions social worker with the Agency for almost two years. She has a master's degree in social work and has adoption clinical training, including how to assess a parent-child bond. Crall has handled 35 adoption cases and has written 25 section 366.26 assessment reports. Social worker Crall continued to recommend that Elijah's permanent plan be adoption. In Crall's opinion, Elijah had an anxious attachment to his mother. She opined that his anxiety stemmed from being placed in dangerous situations and out of fear that Brittny might leave. During supervised visits, Brittny generally attended to Elijah's needs. Crall opined that generally speaking there is a natural assumption that it is detrimental for a child to lose

his parent, however, in Elijah's case the permanency and stability offered by adoption outweighed any detriment he would suffer if parental rights were terminated.

Regarding Elijah's placement, Crall testified that Joyce felt pressured to keep Elijah. Elijah felt safe and comfortable in Joyce's home, and Crall did not have any concern about Joyce's care of Elijah. Crall opined that it would be emotionally detrimental to Elijah to be removed from Joyce's care. However, given Joyce's wavering on whether she wanted to keep Elijah long-term, Crall was concerned with the stability of the placement and opined that Robin was in a better position to raise Elijah. Brittny wanted Elijah to be moved to Robin's home because she felt she would see him more if he was in Robin's care.

3. *Testimony of Joyce*

Joyce testified that she had been Elijah's caregiver for approximately a year-and-a-half. Elijah called her "Momma" and she felt strongly bonded to him. Joyce admitted that in the beginning she wavered "a little" about adopting Elijah because she had a lot of people "in [her] ear," however, she now wanted to adopt him. Joyce testified that in the August 2013 TDM, she indicated she wanted to adopt Elijah if the Agency recommended a plan of adoption. She only supported Robin getting placement of Elijah under a plan of legal guardianship because Joyce felt that such a plan would give Brittny a chance to get custody of Elijah at a later date.

Joyce, too, intended to allow Elijah to remain in contact with Brittny. Joyce claimed she did not feel pressured to adopt Elijah as previously reported.

4. *Testimony of the father*

The father testified that he was grateful Elijah was being cared for by family and he was neutral regarding the placement issue. Regarding the decision to move Elijah, the father maintained he would be "happy with whatever decision that the Court makes."

5. *Testimony of Social Worker Romero*

Social worker Romero was the initial worker on the case when the case was in reunification. She observed Elijah in Joyce's care numerous times throughout the history of the case. She testified that Joyce and Elijah had a strong relationship and Joyce had always been caring and committed to Elijah. Romero opined that it would be detrimental to remove Elijah from Joyce's care because Elijah was bonded to Joyce. Joyce had indicated that she was willing to care for Elijah on a permanent basis and had made it "very clear" to Romero that she wanted to adopt him.

6. *Testimony of Robin M.*

Robin testified that when she stepped forward and asked to be considered for placement of Elijah she was under the impression it was under a plan of legal guardianship. Her asking for placement was a result of family members arguing over who would take care of Elijah. Robin felt that Elijah would be adopted outside of the family if she did not ask for placement of Elijah. When asked how she felt about adopting Elijah, Robin indicated that the only way she really would have adopted him was if the family could not make a decision and Elijah was going to be adopted by a total stranger. Robin felt that Elijah was comfortable and happy in Joyce's care and Robin agreed to help Joyce with child care if needed.

10

7. *The court's ruling*

Following argument from counsel, the court denied the Agency's request to place Elijah with Robin. The trial court then found Elijah to be an adoptable child, that no exception to preclude adoption applied, and terminated parental rights. Elijah's current caretaker, Joyce, was designated as the prospective adoptive parent. In doing so, the court found that Elijah "has a substantial emotional bond to the current caregiver, Joyce." The court also found that "removal would create a detriment to the emotional well being of [Elijah]." The court also found Elijah's "need for stability outweighs the parent/child bond."

## DISCUSSION

A. *Permanent Placement with Joyce*

When a child is removed from parental custody, the Legislature prefers placement with the child's relatives. (*In re Antonio G.* (2007) 159 Cal.App.4th 369, 376-377.) Relatives are given preferential consideration for placement. (§§ 361.3, subd. (a), 16000, subd. (a), 16501.1, subd. (c)(1).)

Before a child may be placed in a relative's home, the social worker must assess the appropriateness of the placement. (§ 361.4, subd. (a).) The relative's home must meet the same safety standards used in licensing foster homes. (§§ 309, subd. (d), 361.3, subd. (a)(8), 16501.1, subd. (c)(1).) If the person has no criminal record (other than minor traffic violations), the social worker and the court may consider the home for placement of the child under section 361.3. (§ 361.4, subd. (d)(1).)

11

In considering whether to place the child with a relative, section 361.3 directs the social worker and court to consider the best interest of the child, including the child's special physical, psychological, educational, medical or emotional needs; the wishes of the parent, the relative and child, if appropriate; the proximity of the placement to the natural parents to facilitate visitation and family reunification; the nature and duration of the relationship between the child and the relative; the relative's desire to provide legal permanency for the child if reunification is unsuccessful; and the safety of the relative's home. (§ 361.3, subd. (a).) In addition, the social worker and the court assess the ability of the relative to: provide a safe, secure and stable environment for the child; exercise proper and effective care and control of the child; provide a home and the necessities of life for the child; protect the child from his or her parents; facilitate court-ordered reunification efforts with the parents, visitation with the child's other relatives and implementation of all elements of the case plan; provide legal permanence for the child if reunification fails; and arrange for appropriate and safe child care, as necessary. (§ 361.3, subd. (a)(7).)

We review the juvenile court's placement decision under section 361.3 for abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

We conclude the juvenile court did not abuse its discretion when it placed Elijah with Joyce.

While Joyce at first was hesitant about adopting Elijah, this was because she had concerns regarding day care and was based on her belief that Robin wanted to obtain

12

legal guardianship, not adoption. The evidence showed that at the section 366.26 hearing the only person that was ambivalent about adoption was Robin.

Robin testified that when she asked to be considered for placement of Elijah, she thought she would be assuming legal guardianship, not adoption. She asked for placement because family members were pressuring her. The only way she would adopt Elijah was if he was going to be adopted by a total stranger.

Joyce on the other hand testified that she strongly wanted to adopt Elijah. She admitted that she had wavered in the past because of day care issues, but now had those issues resolved. Once she realized the agency was recommending Robin adopt Elijah, Joyce reaffirmed her commitment to adopting him.

Elijah called Joyce "Momma" and Joyce was extremely bonded to him. The evidence also showed that Joyce was an excellent caregiver and that Elijah was thriving under her care.

Social worker Crall opined that it would be emotionally detrimental to remove Elijah from Joyce's care. Social worker Romero also testified that it would be detrimental to remove Elijah from Joyce's care given Elijah's bond with her. In the opinion of social worker Romero, Joyce never wavered in her long-term commitment to Elijah.

Based upon all these facts, we conclude the juvenile court did not abuse its discretion in refusing to disrupt Elijah's placement with Joyce.

B. *Beneficial Parent-Child Relationship*

Brittny asserts the court erred in not applying the parent-child relationship exception to the termination of parental rights. We reject this contention.

"Adoption . . . is the permanent plan favored by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds by clear and convincing evidence that a child is adoptable, it becomes the parent's burden to show that termination of parental rights would be detrimental to the child because a specified statutory exception exists. (*Id*. at p. 574.) Under the exception found in section 366.26, subdivision (c)(1)(B)(i), the parent is required to show termination would be detrimental in that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." In *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534, the Court of Appeal noted "[c]ourts have required more than just 'frequent and loving contact' to establish the requisite benefit for [the] exception."

In reviewing whether there is sufficient evidence to support the trial court's finding, the appellate court reviews the evidence in the light most favorable to the trial court's order, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.)

Here, under the first prong of the beneficial relationship exception, Brittny cannot show that she maintained regular visitation and contact with Elijah. While there were certain months during the reunification and adoption phase where she had regular contact

with Elijah, overall her visitations were inconsistent over the course of the over-two-year dependency.

In March 2012 she ended one visit early when Elijah fell asleep, stating, "I wanted to play with him, not watch him sleep." In May 2012 Brittny missed two visits. As Brittny admits, between August and October 2012 her visits were sporadic.

She did not visit Elijah the entire month of June 2013. In July she only visited him once. In August she visited Elijah twice, but left one visit early without telling the social worker.

As to the second prong of the exception, Brittny cannot show she had a relationship with Elijah that was so beneficial that termination of parental rights would greatly harm Elijah, and that the harm outweighed the benefits of adoption. Even frequent and loving contact does not outweigh the benefit of adoption when the parental role has been abandoned. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1420; see also *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["While the relationship between [father] and [son] is pleasant and emotionally significant to [the son], it bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship."].)

Elijah has been a dependent since he was six months old, over two-thirds of his life. Elijah has been living with Joyce throughout most of his dependency and has done extremely well in her home. He developed a strong bond and sense of security with Joyce. He called Joyce "Momma." Joyce wanted to adopt Elijah.

15

In sum, the juvenile court did not err in selecting and implementing a plan of adoption for Elijah.

## DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McINTYRE, J.